**CHOICE HOTELS INTERNATIONAL, INC., Plaintiff,**

v.

**Suresh C. KAUSHIK, et al., Defendants.**

**No. CIV.A.99–T–1250–N.**

United States District Court, M.D. Alabama, Northern Division.

Nov. 27, 2000.

Joseph Lister Hubbard, Barbara J. Gilbert, Capell & Howard, PC, Montgomery, AL, for Choice Hotels International, Inc., plaintiff.

Priscilla Black Duncan, P.B. Duncan & Associates, LLC, Montgomery, AL, Suresh C. Kaushik, Pro se, Montgomery, AL, Roianne Houlton Frith, The Law Offices of Roianne, Houlton Frith & Associates, Montgomery, AL, for Suresh C. Kaushik, Alasouth Corporation, defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Choice Hotels International, Inc., the owner of several national hotel chains including the Econo Lodge motels, filed this lawsuit on October 19, 1999, asserting several claims of unfair trade practices arising under federal and state law. Choice Hotels initially named four defendants, but after settling its claims with and moving for voluntary dismissal of two of them, only two defendants remain: Suresh C. Kaushik and AlaSouth, Inc., of which Kaushik is the principal owner. Because Kaushik is the principal owner of AlaSouth and because Choice Hotels does not assert distinct claims against Kaushik and AlaSouth, the court will refer to both defendants collectively as "Kaushik."

The focus of Choice Hotels' claims is Kaushik's use of the name "Econotel" for a motel that he owned across the street from one of Choice Hotels' Econo Lodge franchises; Choice Hotels contends that the name and the design of the sign used by Kaushik are unlawfully similar to those which Choice Hotels was already using and had registered as trademarks. Choice Hotels raises two Lanham Act claims at trial: infringement on its service marks under 15 U.S.C.A. § 1114 and infringement on trade dress 15 U.S.C.A. § 1125(a)(1)(A). It also raises a common-law service-mark-infringement and unfair-competition claim under the laws of Alabama. Choice Hotels properly invoked the jurisdiction of this court for its federal claims under 15 U.S.C.A. § 1121 (Lanham Act) and 28 U.S.C.A. § 1331 (federal question), § 1338 (trademark claims), and pursuant to 28 U.S.C.A. § 1367(a) for supplemental jurisdiction over the state-law claims. Based on the evidence presented at a bench trial held on October 16–18, 2000, this court finds that, while the issues presented are very close, judgment should be entered in favor of Kaushik and against Choice Hotels on all claims.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Background

Since 1954, Choice Hotels and its predecessors in interest have operated and fran-

chised motels and hotels throughout the United States. Choice Hotels has a worldwide system of over 5,000 inns, hotels, suites and resorts, including both daily and extended-stay properties. Choice Hotels' Econo Lodge brand has 741 franchisees located throughout the United States and Canada. Three of these are in the greater Montgomery area; one, a franchise located at 1040 West South Boulevard, is located across the street from the motel formerly owned and operated by Kaushik.

Econo Lodge franchisees operate in the highly-competitive budget motel sector of the hospitality industry. Franchisees pay Choice Hotels an initial franchise fee and an annual royalty of four percent for the right to use Choice Hotels' trademarks, trade dress, and other services offered by Choice Hotels. Choice Hotels also operates a nationwide, toll-free, telephone reservation system, and online reservations, and provides nationwide advertising. In return, franchisees must maintain quality standards established by Choice Hotels and are subject to regular quality reviews. Each Econo Lodge franchise has the flexibility to establish its own nightly room rate based on the local market.[1] Franchisees are also free to engage in their own advertising.

Choice Hotels has thirteen registered service marks for the Econo Lodge brand.

The registered marks include: the word "Econo;"[2] four designs for "Econo Lodge;"[3] the telephone number 1–800–55–ECONO;[4] two designs of "Econo Lodge Spend a Night Not a Fortune;"[5] the "Econo Lodge" plaid design;[6] the words "Senior Class;"[7] one design for "Econo–Travel Motor Hotel Corp;"[8] the words "Spend a Night Not a Fortune;"[9] and the words "The Econo Lodge Choice."[10] These marks are registered for use in connection with hotel and motel services. This dispute centers around Choice Hotels' Econo mark and three of the "Econo Lodge" design marks.[11]

From 1992 to 1999, Kaushik operated a motel business in two buildings located at 1015 West South Boulevard in Montgomery, Alabama. Combined, the two buildings have 112 rooms. The 1015 West South Boulevard property is almost directly across the street from 1040 West South Boulevard Econo Lodge; the properties are well within sight of one another.

Between July 9, 1993, and March 7, 1997, Kaushik was a franchisee of the Hospitality International Corporation, operating a Red Carpet Inn. Kaushik's franchise with Hospitality International was terminated in March 1997 for failure to maintain the property and to pay franchise fees. Nonetheless, he continued to display a Red Carpet Inn sign on his property.[12] After

---

1. The nationwide average rate is $ 46.50. The Econo Lodge at 1050 West South Boulevard rents rooms from between $ 40 and $ 45 a night, with rates as low as $ 35 per night for extended-stay guests.

2. United States Patent and Trademark Office [USPTO] Reg. No. 1,679,749.

3. USPTO Reg. Nos. 813,642, 1,799,814, 1,808,184, and 2,178,518.

4. USPTO Reg. No. 1,811,900.

5. USPTO Reg. Nos. 1,266,021 and 1,261,310.

6. USPTO Reg. No. 1,043,140.

7. USPTO Reg. No. 1,832,963.

8. USPTO Reg. No. 1,216,987

9. USPTO Reg. No. 1,018,173

10. USPTO Reg. No. 1,799,807.

11. USPTO Reg. Nos. 1,679,749, 1,799,814, 1,808,184, and 2,178,518. A fourth "Econo Lodge" design, USPTO Reg. No. 813,642, bears no resemblance to Kaushik's Econotel design.

12. *See* Plaintiff's Ex. 55.

issuing several warnings of possible trademark infringement, Hospitality International removed the sign from Kaushik's property at its own expense.

With his business declining and now in search of a name for his motel, Kaushik developed the name Econotel. At the time he conceived of Econotel, a Choice Hotels Econo Lodge franchise was located across the street. Kaushik maintains that the neighboring Econo Lodge did not influence him as he developed the name, and that he had no intent to infringe upon Choice Hotels' service mark to benefit his own business. Kaushik conducted a cursory search for the name in area Yellow Page directories, and finding no businesses named Econotel, he registered Econotel with the Alabama Secretary of State.[13] At no time did Kaushik undertake a search of service marks registered with the United States Patent and Trademark Office or attempt to register Econotel or the Econotel logo for federal trademark protection.

In the spring of 1998, Kaushik placed an advertisement in the 1998–99 BellSouth Yellow Pages advertising the Econotel in the book's "Motels" section.[14] The advertisement promoted "daily and extended stay" rooms with refrigerators and microwaves, truck and camper parking, and facilities for receptions, meetings and banquets. That advertisement was reprinted, substantially unchanged, in the 1999–2000 and 2000–01 versions of the Yellow Pages.[15] Aside from Yellow Pages adver-

tising, Kaushik did not advertise in any other media.

Kaushik made no changes to the exterior of his property to display the Econotel name until August 1998 when he employed Vinyltech Signs & Decals ("Vinyltech") of Millbrook, Alabama, to produce two six-foot by 20–foot white vinyl banners with the Econotel name and logo. The design was conceived by Kaushik; it included the Econotel name in red, the reclining man symbol and the words "daily & extended stay" both printed in blue. Both the sans-serif font and fire-engine red color used in the banners were among the most common used by Vinyltech customers. Kaushik mounted these banners on the permanent sign post outside his property.

From the time the Econotel banners were put up until he sold his property in October 1999, Kaushik's business primarily catered to low-income individuals who sought accommodation for extended periods of time. Daily rentals accounted for 36% of Kaushik's revenue during 1998 and 24% during the first ten months of 1999.[16] On average, a room at the Econotel cost about $25 a night.

Soon after Kaushik mounted his exterior Econotel banners, a Choice Hotels field representative, Tom Dolan, noticed the banners on a routine trip to the Econo Lodge franchise on West South Boulevard. After Dolan notified Choice Hotels' home office, Choice Hotels' senior attorney, Paul

---

**13.** Alabama registration of the Econotel name became effective June 10, 1998. *See* Plaintiff's Ex. 60. Kaushik's Econotel logo (the word Econotel in sans serif lettering, with the letters "E" and "t" connected and underlining the "cono," and the picture of a reclining man) was also registered on that date. *See id.*

**14.** *See* Plaintiff's Ex. 23.

**15.** *See* Plaintiff's Ex. 24 and 25. Kaushik contended at trial that this last advertisement was a mistake, not attributable to him.

Choice Hotels has not provided any document showing Kaushik authorized this advertisement, although such authorizations were provided for the 1998 and 1999 advertisements. *See* Plaintiff's Ex. 27. In the absence of such a confirmation by Kaushik and in light of the fact that he no longer ran the Econotel when it should have been placed, the court believes Kaushik had nothing to do with this final Econotel advertisement.

**16.** See Plaintiff's Ex. 38.

Jorgensen, sent a letter to Kaushik on September 9, 1998, to notify him of a possible trademark infringement.[17] After a series of contentious letters between Choice Hotels and Kaushik through their counsel, Kaushik claims that in 1999 he gave up his nightly business entirely and focused exclusively on long-term, apartment-style rentals, but the evidence showed that he continued to receive income from both daily- and extended-stay guests.[18] In October 1999, Kaushik sold half his property to Chiranji Sharma and Fred Walker and closed the building he continued to own. Included in the purchase and sale agreement was permission for Sharma and Walker to use the Econotel name and sign for one year, though Kaushik retained rights to the Econotel name.[19] The Econotel sign remained in place until December 1999.

### B. Trademark Infringement (15 U.S.C.A. § 1114)

Under 15 U.S.C.A. § 1114(1)(a), trademark infringement is defined as the unauthorized use "in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that is "likely to cause confusion, or to cause mistake, or to deceive." In order to prove a violation of § 1114, a plaintiff must produce evidence demonstrating two elements: (1) that his mark has priority over the mark being used by the defendant, and (2) that the defendant's use of the mark is likely to cause confusion among consumers. See Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir.1999); Dieter v. B & H Industries of Southwest Florida, 880 F.2d 322, 326 (11th Cir.

1989), cert. denied, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). In this case, Kaushik does not dispute that Choice Hotels' marks, which were federally registered and had been in use for several years, have priority over Econotel. Thus, the central issue for the court is whether Kaushik's use of the Econotel name and design was likely to cause consumer confusion.

In order to evaluate whether the use of a particular mark is likely to cause confusion, courts in the Eleventh Circuit consider the following seven factors: (1) the type of mark used by the plaintiff, (2) the similarity of the marks, (3) the similarity of the goods or services represented by the marks, (4) the similarity of the retail outlets and the customers served, (5) the similarity of the advertising media used by the parties, (6) whether the defendant had the intent to infringe, and (7) any evidence of actual consumer confusion. See Frehling, 192 F.3d at 1335; Dieter, 880 F.2d at 326; John H. Harland Co. v. Clarke Checks, 711 F.2d 966, 974 (11th Cir.1983). Of these seven elements, the type of mark used by the plaintiff and any evidence of actual confusion should be weighted most heavily. See Frehling, 192 F.3d at 1335; Dieter, 880 F.2d at 326.

#### 1. Type of Mark

This factor is a measure of the strength of the plaintiff's mark, and hence the degree of legal protection that should be afforded it. Determination of the type, and strength, of a mark is a two-step process: (1) determining what category—generic, descriptive, suggestive, or arbitrary—the mark is; and (2) determining

---

**17.** See Plaintiff's Ex. 10.

**18.** Although Kaushik may have taken steps at that time to convert his business to exclusively extended-stay rentals—like closing the front desk after business hours—figures calculated

by plaintiff's expert indicates that he continued to receive a constant amount of revenue from daily lodgers. See Plaintiff's Ex. 38.

**19.** See Plaintiff's Ex. 72.

what the relative market strength of the mark is. *See John H. Harland,* 711 F.2d at 975.

The courts in the Eleventh Circuit use four categories to classify the type of mark: generic, descriptive, suggestive, and arbitrary. *See Frehling,* 192 F.3d at 1335. These categories distinguish among marks based on the nature of the relationship between the mark and the product or service that it represents. *See id.* The closer the relationship between the mark and the product, the less legal protection is afforded to the mark. The lines distinguishing among these categories are not brightly defined. "Although meant as pigeon-holes, these useful labels are instead central tones in a spectrum; they tend to merge at their edges and are frequently difficult to apply." *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 (5th Cir. 1980),[20] *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981).

The first category, generic marks, includes all marks that signify the product or service directly. *See Frehling,* 192 F.3d at 1335; *Dieter,* 880 F.2d at 327; *John H. Harland,* 711 F.2d at 974. For example, using the name "Liquor Store" for a liquor store would be a generic mark. Generic marks are considered the weakest marks, and are afforded the least protection under the law. *See id.* The next level of legal protection is given to descriptive marks, which identify a quality or characteristic particular to the product being represented by the mark. *See id.* The name "Vision Center" for an eyeglasses store is an example of a descriptive mark. Suggestive marks, which are given the next highest protection, suggest characteristics of the service or product, and require some degree of imagination on the consumer's part to make the connection between the

two. *See id.* Using the name "Penguin" to denote a refrigerator company is an example of a suggestive mark. Finally, an arbitrary mark is one that bears no relationship to the product or service it represents; for example, "Sun Bank" is an arbitrary mark because the image of the sun is not in anyway suggestive of the banking industry. *See id.* Arbitrary marks receive the highest level of protection under the Lanham Act because they are the most distinctive and thus most likely to be associated by consumers with a particular product or service. *See id.*

Third-party use, secondary meaning, and the incontestability of a mark are all relevant for the second part of the test, strength of the mark in the market. Third-party usage of the mark is inversely related to its strength: the more the mark is used by third parties, the weaker it is considered to be. *See Frehling,* 192 F.3d at 1336 (holding that the district court committed reversible error by failing to consider the third-party usage of the plaintiff's mark); *John H. Harland,* 711 F.2d at 975. At the same time, however, the court notes that "a further consideration relevant in determining the significance of third-party use is the entire name a third party uses, as well as the kind of business in which the user is engaged." *Safeway Stores v. Safeway Discount Drugs,* 675 F.2d 1160, 1165 (11th Cir.1982).

■ The court must also inquire as to whether the mark has acquired a "secondary meaning," that is, whether the mark "has become distinctive of the trademark holder's product." *Dieter,* 880 F.2d at 328. A plaintiff who can prove consumer acceptance and recognition of its mark is entitled to greater protection than one who has not. A mark's acquisition of incontest-

---

**20.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

able status contributes to this analysis. *Frehling,* 192 F.3d at 1335. In order to prove that its mark is incontestable, a plaintiff must demonstrate that the mark "has been registered for five years with the Patent & Trademark Office, its holder has filed the affidavit required by 15 U.S.C. § 1065(3) with the Patent & Trademark Office, and the Patent & Trademark Office has accordingly declared the mark 'incontestable'." *Id.* at 1336. Incontestability alone, without other evidence of consumer recognition, is not conclusive proof of a mark's secondary meaning and strength.

■ This first factor weighs in favor of Choice Hotels. Under the first part of the test, the court finds that Choice Hotels' marks are only descriptive. A descriptive mark "describes a characteristic or quality of the product or service, such as ... desirable features," and requires little imagination on the part of the consumer to reach a conclusion as to the nature of the product being sold. *John H. Harland,* 711 F.2d at 974. "Econo" and "Econo Lodge" are exactly that. "Econo" is a shortened form of "economy" which, in this context, refers to "frugality in expenditures sometimes verging on parsimony." Webster's Third New International Dictionary 720 (1976). "Lodge" is a ubiquitous term for a short-term accommodation. As Choice Hotels' Tim Shuy testified at trial, nightly room price drives competition in the hotel business. "Econo" and "lodge" in the name of the product sends an unambiguous signal to consumers that accommodations are a value, reasonably priced compared to other alternatives, and especially suited for the budget traveler.

■ As descriptive marks, "Econo" and "Econo Lodge" are only entitled to trade-mark protection if they have acquired a secondary meaning. *See Safeway Stores,* 675 F.2d at 1165 n. 9. This inquiry brings the court to the second prong of the type of mark test, that which relates to market strength. The "Econo Lodge" design has obtained secondary meaning that entitles it to trademark protection. The simple fact that there are well over 700 Econo Lodge franchises throughout the United States and Canada leads the court to conclude that the name is associated with Choice Hotels' brand. Choice Hotels consistently markets Econo Lodge using exterior signs with red letters on a white background; no other symbols or words are used. Kaushik has presented no credible evidence that third-parties in the industry use the Econo Lodge name. Further, two of the three relevant "Econo Lodge" designs have attained incontestable status.[21]

■ The court does not extend this finding to the "Econo" mark.[22] No evidence was presented that "Econo" alone is actively used by Choice Hotels in conjunction with its Econo Lodge brand. The phrase "Econo" does derive some strength from its incontestable status, which the mark has attained.[23] Without any evidence of consumer association between "Econo" alone and Choice Hotels products, however, protection for this mark is weak.

### 2. *Similarity of the Marks*

■ In order to determine the degree of similarity between Choice Hotels and Kaushik's marks, the fact finder must "consider[ ] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling,* 192 F.3d at 1337; *see also E. Remy Martin & Co. v. Shaw–Ross Int'l Imports,* 756 F.2d 1525, 1531 (11th

---

**21.** USPTO Reg. No. 1,808,184. *See* Plaintiff's Ex. 6.

**22.** USPTO Reg. No. 1,679,649.

**23.** *See* Plaintiff's Ex. 6.

Cir.1985); *John H. Harland,* 711 F.2d at 975 ("The similarity of design is determined by considering the overall impression created by the mark[s] as a whole rather than simply comparing individual features of the marks.") (quoting *Exxon v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 504–05 (5th Cir.1980)).

This factor weighs in favor of Kaushik. The focus of this inquiry is the Econotel sign Kaushik mounted on the sign post outside his property and the related name and logo as used in Kaushik's advertising in the Yellow Pages.[24] Of course, the similarities between Econo Lodge and Econotel are readily apparent. Foremost are the shared use of "econo" and relationship between "lodge" and "tel," short for "hotel." When spoken, the two sound unmistakably related. Choice Hotels also notes that both its "Econo Lodge" designs and the Econotel sign have red letters on a white background.

The court finds, however, that the marks, when compared in their entireties, could not confuse the reasonable consumer. When Kaushik used the Econotel name, it was accompanied by additional and distinguishing characteristics that set it apart from Choice Hotels' marks. Most distinctive was the blue graphic of a reclining man placed below the last two letters of Econotel. The word Econotel itself was printed in a different font than customers expect on Econo Lodge signs, and the layout of the text—the letters "E" and "t" connected to underline "cono"—was unlike any layout registered or used by Choice Hotels. Kaushik's sign also had the phrase "daily and extended rates" written in white letters on a blue background along the bottom of the sign.

By comparison, the only thing distinctive about the simple, "Econo Lodge" design is

that it is used consistently by other Econo Lodge franchises. Reinforcement through repetition is an understandable marketing goal, and Choice Hotels accomplishes this through repetitive use of its design. The greater the recognition of a logo, the more likely the average consumer will recognize differences from it. The consistency and simplicity of the "Econo Lodge" design only underscores the differences between it and Kaushik's design. The different lettering, reclining man, and additional text on the Econotel design are exactly the sort of differences that prevent confusion by the average consumer.

### 3. *Similarity of the Goods*

■ "This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling,* 192 F.3d at 1338; *see also E. Remy Martin,* 756 F.2d at 1530.

This factor weighs in favor of Choice Hotels. Choice Hotels has shown that the two products offered here are of the type the public could attribute to a single source, namely, hotel/motel accommodations. The same conclusion is warranted even if Kaushik's business is characterized primarily as "extended stay" lodgings, which is supported by the evidence. Although Econo Lodge is not marketed by Choice Hotels as an extended-stay product, Choice Hotels, like others in the hotel industry, offers an extended-stay product, MainStay Suites, and daily-stay brands like Econo Lodge. It is reasonable for consumers to attribute multiple brands, both daily and extended stay, to the same parent company and therefore reasonable, on this element, for confusion to exist.

---

**24.** No evidence was presented that consumers were exposed to the Econotel design in any

other ways.

#### 4. Similarity of the Parties' Retail Outlets and Customers

■ "This factor takes into consideration where, how, and to whom the parties' products are sold." *Frehling,* 192 F.3d at 1339. The likelihood of confusion is reduced when the goods of the parties are sold to different classes of buyers through different channels of distribution, even when there is some similarity between the products. *See* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:51 (4th ed.2000) (hereafter McCarthy, Trademarks). The Eleventh Circuit Court of Appeals, however, has warned against this type of differentiation among customers along economic lines: "We are troubled by the district court's methodology of dividing the world up into distinct segments of 'affluent' and 'less affluent' for the purpose of determining the balance of the instant factor. Common sense suggests that such a categorical distinction is tenuous." *See Frehling* at 1339; *see also* McCarthy, Trademarks § 24:52 ("different price ranges are significant only if they evidence that the goods of each party are considered for purchase by entirely different classes of purchases.")

This factor weighs in favor of Choice Hotels. The evidence presented supports the reasonable conclusion that some overlap between the Econotel and Econo Lodge customers was possible. Both motels catered to individuals looking to stay for one or more nights in the Montgomery area and both were located at a busy highway exit populated with low- and reasonably-priced accommodations. A consumer could exit the highway undecided as to where he would stay, and choose either the Econo Lodge or Econotel; another could go from motel to motel at that intersection looking for the best weekly rate. The court credits Kaushik's testimony that his business focus was extended-stay accommodations, but that alone, in light of the physical proximity of the businesses, is not enough to fully distinguish the retail outlets.

The only way for Kaushik to prevail on this factor is to make exactly the argument that the Eleventh Circuit has discouraged: that the Econo Lodge and Econotel catered to different economic classes of consumers. There is little question that during 1998 and 1999, the typical consumer could easily distinguish the Econotel, which was in a state of disrepair, and the Econo Lodge, which had well-kept grounds and facilities. The rooms were priced accordingly; Econotel's rate averaged about half that of the Econo Lodge. Even so, the likelihood of an overlapping customer base as noted in *Frehling* still exists, *see* 192 F.3d at 1339, and there remain too many similarities between the Econo Lodge and Econotel for this court to conclude that the businesses operated in different markets.

#### 5. Similarity of the Advertising Media

■ The fifth of seven factors used by the courts in determining whether Kaushik's mark is likely to confuse consumers is the similarity in the methods of advertising used by the parties. *See Frehling,* 192 F.3d at 1339.

This factor weighs in favor of Kaushik. Kaushik's advertising differed in scope and style from advertising done by Choice Hotels on behalf of its Econo Lodge brand. Choice Hotels advertises nationally; franchisees benefit from these nationwide advertisements and reservation systems. Many franchises also offer discounts through national membership organizations like the Automobile Association of America. Kaushik used no such national outlets; in fact, he had little money for advertising, even locally. The only advertising he did do was through his Econotel

sign, and in the local BellSouth Yellow pages.

Choice Hotels makes much of the fact that Kaushik placed Econotel advertisements in the "Motels" section of the Yellow Pages, the same section in which the three Montgomery-area Econo Lodge franchisees advertised.[25] As an initial matter, the court notes that Choice Hotels presented no evidence that Choice Hotels, either as a general policy or in this case in particular, advertises in local Yellow Pages on behalf of its franchisees. Given the differences in the advertisements from franchise to franchise, it appears that these local advertising decisions are made by the franchisees themselves; none is a party to this lawsuit. Thus, Kaushik's Yellow Page advertisements do not overlap at all with Choice Hotels' advertising.

However, assuming it is proper to consider advertisements placed by franchisees to be part of Choice Hotels' advertising scheme, they are dissimilar in style and would not be likely to cause confusion among consumers. The advertisement Kaushik placed in the 1998–99 Yellow Pages, the first Yellow Pages in which the Econotel name was used, was substantially the same as the advertisement he placed in the 1997–98 Yellow Pages as a Red Carpet Inn franchisee. Both included the slogans "LESS MONEY ... MORE SERVICE," "DECENT FAMILY LIVING AT REASONABLE RATES," and "BEST RATES IN TOWN!" and noted the availability of daily and extended-stay rates. The most significant change was that Kaushik began to use the Econotel logo with the reclining man symbol in his advertisements.

In contrast, the Yellow Pages advertisements of the Econo Lodge franchises bear a much more striking resemblance to each other, as they should, than any do to Kaushik's advertisements. Each displays the "Econo Lodge" design, which bears even less resemblance to the Econotel design when on the printed page in black and white. Further, the Econo Lodge advertisements generally offer a set of amenities that appeal to a different type of consumer than those looking for "decent family living at reasonable rates;" for example, free continental breakfast, luxury king-sized beds, free HBO and cable television, and pools.

Finally, Econotel's exterior sign was of a vastly inferior quality compared to the typical Econo Lodge sign. Kaushik's two vinyl banners cost $ 438.[26] Econo Lodge signs are made out of a durable plastic that cost in the range of $4,000–$5,000. This difference in quality was readily noticeable to the court, and would be to the average consumer. The average consumer recognizes logos and recognizes that franchisors impose a uniformity on franchisees. The average consumer would have little difficulty distinguishing the professional quality of Choice Hotels' mark from the amateur and low-budget signs and advertisements produced by Kaushik.

### 6. Defendant's Intent

■ Next, the court must consider whether Kaushik, in choosing the disputed name and design, intended to infringe on Choice Hotels' trademark. See Frehling, 192 F.3d at 1340. Even if Kaushik did not actively intend to infringe on Choice Hotels' trademark, it is possible to find that his intentional blindness to the potential for confusion between his mark and that belonging to Choice Hotels was tantamount to an intent to infringe. See Frehling, 192 F.3d at 1340.

This factor weighs in favor in Choice Hotels. Kaushik failed to produce credible testimony at trial that he had no knowledge of Choice Hotels' "Econo Lodge"

25. See Plaintiff's Exs. 23–26.

26. See Plaintiff's Ex. 66.

mark; in fact, the court is convinced that Kaushik's strained explanations of his intent and creative inspiration were deliberately misleading. It defies believability, as Kaushik contends, that he simply did not notice the Econo Lodge and its sign across the street from his property, and that these had no influence on the derivation of the name Econotel.[27] The court finds that Kaushik, aware of the Econo Lodge brand and in search of a name for his own motel, came up with a name that, as he testified, "struck" him—in other words, he conceived of a name that sounded like the name a national chain would use. Inherent in that choice was the likelihood of causing customer confusion.

The court notes that it makes this finding in the absence of any evidence of actual intent to infringe. Based on Kaushik's testimony and the evidence presented surrounding the development of the Econotel mark, the court finds Kaushik was intentionally blind to the potential for consumer confusion. Under the law of this circuit, intentional blindness is sufficient to impute intent to Kaushik. *See Frehling*, 192 F.3d at 1339 (finding intentional blindness and intent in the absence of a conscious intent to infringe where the infringer had been refused registration of his trademark because of the likelihood of confusion.) Choice Hotels advances two theories to prove that Kaushik consciously intended to infringe on its marks: (1) that the similarity of the Econotel and Choice Hotels marks evidences his intent; and (2) that Kaushik has a history of violating trademarks law and he was did the same thing here. The court finds that aside from the name Econotel, other elements of Kaushik's design were motivated by cost, not by an intent to infringe and cause confusion.

In 1998, Kaushik was operating on a shoestring budget. The court credits testimony from Kaushik and Jody Pierce, manager of Vinyltech, that the design decisions that went into Kaushik's sign were a product of Kaushik's financial constraints rather than an attempt to copy the "Econo Lodge" marks. Choice Hotels failed to establish otherwise. The "Econo Lodge" designs are decidedly simplistic—basic red block letters on a white background. A simple design is also an inexpensive one. Kaushik's explanation of how he came to his design is credible. Kaushik intended to illuminate these vinyl banners from behind so they could be seen at night. This made a color background unworkable. The red letters were "fire engine red," the most popular version of red used by Vinyltech.[28] Pierce's testimony supported Kaushik's testimony that he did not consciously make these design decisions to copy Choice Hotels' mark. Kaushik never showed or discussed Choice Hotels' marks with Pierce. Pierce also testified that Kaushik did not request any particular font, and that the font used was selected by computer approximation from Kaushik's original, hand-sketched design.

Choice Hotels also failed to produce evidence establishing that Kaushik actually considered himself in direct competition with the Econo Lodge or any of the budget hotels that neighbored his property. For all his problems in the hotel business, Kaushik understood one thing: his property was in no condition to compete with well-kept national franchises like Econo Lodge. His goal of surviving on the ex-

---

27. Only when asked directly by the court was Kaushik willing to admit that he would have been able to give directions to the Econo Lodge, across the street, if an individual entered the Econotel and asked him.

28. Red is also the most visible color from a distance on signs.

tended-stay clientele was reflected in the rates he charged for his rooms and his advertising. Believing, as the court does, that Kaushik did not see himself as a direct competitor to these chain motels, the court cannot conclude Kaushik actually intended to infringe on Choice Hotels' marks to help his business.

This also explains why Kaushik acted as he did in light of the earlier trademark dispute he had with Hospitality International and notice from Choice Hotels about potential infringement. Choice Hotels argues that Kaushik is a serial infringer. The court finds Kaushik was oblivious to the consequences of his acts with respect to trademark law. Kaushik's failure to give up the Econotel name when Choice Hotels demanded, and his continued use of the name until the property was sold, was not part of a continuing attempt to promote his business at the expense of Choice Hotels. This does not justify Kaushik's acts, nor does it absolve him of responsibility for them. It does explain, for the purposes of this factor, why his acts were intentional under the law, while not intentional in the literal sense of the word.

### 7. *Actual Confusion*

 The final, and one of the most important, elements in determining whether consumers are likely to be confused by Kaushik's use of the Econotel mark is whether there is any evidence that customers were actually confused. Although such evidence weighs more heavily in favor of infringement than evidence supporting any of the other six factors, the Eleventh Circuit has recognized that such evidence is difficult to unearth, and it has therefore held that such evidence is not necessary to succeed on a trademark infringement claim. *See Frehling,* 192 F.3d at 1340.

This factor weighs in favor of Kaushik. Choice Hotels' evidence consisted of testimony from two employees of the Econo Lodge, Nisha and Rakesh Patel.[29] Nisha Patel, who often works at the Econo Lodge front desk, testified that she was aware of customers that confused the two businesses, but was unable to provide any names of customers or dates to support her claims. In fact, the only specific instances of confusion that she could identify were two occasions when emergency personnel (police and fire) came to the Econo Lodge looking for the Econotel. Patel, once again, failed to identify the dates or any other details of these incidents.

Rakesh Patel's testimony was no more conclusive. At trial he recalled only one incident where he was asked by a customer if the Econo Lodge was in fact the Econotel. This testimony contradicted his deposition testimony, when he recounted "many customers" being confused. Like Nisha Patel, Rakesh Patel could not offer any specifics like names or dates in either his deposition or at trial.[30] Indeed, because of the inconsistency in the testimony of both witness, the court gives the testimony of these two witnesses almost no credence.

In light of this vague and contradictory testimony, the court finds that if there was any confusion it was not substantial. Although the court recognizes that evidence of actual confusion in trademark cases is difficult to secure, in this case—where the "competing" businesses were across the

---

**29.** Nisha Patel manages the Econo Lodge for her father, the owner, and lives on site. Rakesh Patel also lives on site and does maintenance work.

**30.** Both sides claimed that the other had pressured the Patels before trial. Kaushik claimed that Choice Hotels used the leverage of the franchise agreement to secure testimony against him, while Choice Hotels claimed that friends and relatives of Kaushik pressured Rakesh Patel to change his testimony.

street from one another and interaction between motel staff and customers is regular—the apparent lack of concern by the Patels is telling. They, if anyone, would have been aware of confusion faced by customers and sensitive to it. There is no evidence, however, indicating that the Patels took any steps to document the confusion, or to voice concern to Choice Hotels or Kaushik. Further, to the extent that the confusion indicated by the Patels was of emergency personnel and not customers—in the absence any records or clear testimony from the Patels the court cannot determine how many instances of this alleged confusion came from each group—it is significantly less probative of the kind of actual confusion pertinent here. *See Frehling,* 192 F.3d at 1341 ("[I]t is not the number of people actually confused by the marks that is important, but rather the type of person confused.") The Patels' vague and often contradictory testimony lacks force and does not prove, by a preponderance of the evidence standard, there was actual confusion between the Econo Lodge and Econotel.

### 8. Analysis of the Factors

 The question of whether or not confusion was likely is a close one. Indeed, four factors weigh in favor of Choice Hotels, three for Kaushik, and the two most important factors—type of mark and actual confusion—split. Taken in their entirety, however, the factors indicate that a likelihood confusion did not exist.

The four-to-three split in favor of Choice Hotels belies the appropriate weight the factors should have in the present case. Two factors that weigh in favor of Kaushik—similarity of the advertising media and similarity of the mark—do so strongly. In particular, the lack of confusion in marks comes in large part from the success Econo Lodge has had marketing its product. Because Choice Hotels markets its 771 Econo Lodges nationwide and requires all franchisees to adhere to strict quality standards, customers associate a particular look with the "Econo Lodge" mark, a look that is much more professional than the look of Kaushik's Econotel. In practice, aside from the basic similarities noted above, the marks could not confuse the reasonable consumer.

Intent of the defendant only marginally weighs in favor of Choice Hotels. Although the court believes Kaushik was not truthful with his explanation of how he came up with Econotel, the record is void of evidence pointing to an actual intent by Kaushik to infringe upon Choice Hotels' trademark. This is a case of intentional blindness to the possibility of confusion, a finding this court bases on Kaushik's self-admitted ineptitude as a businessman.

Finally, Choice Hotels' "Econo" and "Econo Lodge" design marks merit only moderately strong protection. This is particularly true of "Econo" which is purely descriptive and has little, if any, secondary meaning. The "Econo Lodge" marks are descriptive as well, and only acquire their strength through secondary use. Choice Hotels' marks do not merit the kind of strong protection that suggestive or arbitrary marks with secondary meaning do. Because the other factors are closely divided and because of the relatively weak nature of the protection due here, the court finds no likelihood of confusion existed.

### C. Trade Dress Infringement (15 U.S.C.A. § 1125)

Choice Hotels also raises claims based on 15 U.S.C.A. § 1125, known as Section 43(a) of the Lanham Act. It provides in relevant part:

"Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device ... or any false designation of origin, false or misleading description of fact, or false or misleading

representation of fact, which ... is likely to cause confusion ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

Section 1125 differs from § 1114 by providing protection against infringement of a "trade dress." *See Epic Metals Corp. v. Souliere,* 99 F.3d 1034, 1038 (11th Cir. 1996) ("Section 43(a) of the Lanham Act creates a federal cause of action for trade dress infringement."); *John H. Harland,* 711 F.2d at 980 ("This court and the former Fifth Circuit have held that § 43(a) creates a federal cause of action for trade dress infringement.")

 Rather than signifying only a name or symbol used to represent a service or product, trade dress "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *John H. Harland,* 711 F.2d at 980; *see also Epic Metals Corp. v. Souliere,* 99 F.3d 1034, 1038 (11th Cir.1996); *University of Florida v. KPB, Inc.,* 89 F.3d 773, 776 (11th Cir. 1996); *Bauer Lamp Co. v. Shaffer,* 941 F.2d 1165, 1170 (11th Cir.1991). In order to. succeed on a claim of trade dress infringement, plaintiff must demonstrate (1) that the product is distinctive or has developed a secondary meaning, (2) that the features in question are nonfunctional, and (3) that the similarity between the parties' products is likely to cause confusion. *See Epic Metals,* 99 F.3d at 1038; *Bauer Lamp,* 941 F.2d at 1170; *John H. Harland,* 711 F.2d at 980.

The court has already reached two of the three elements of a trade dress infringement claims under 15 U.S.C.A. § 1125: secondary meaning and likelihood of confusion.[31] Choice Hotels' "Econo Lodge" marks have developed a secondary meaning, but a likelihood of confusion did not exist. Because Choice Hotels failed to meet its burden on one factor, and all three must be present for valid claim, this court need not reach the question of whether the features of the trade dress were non-functional. Absent confusion between the products, Choice Hotels' 15 U.S.C.A. § 1125 claim also fails.

### D. State Common–Law Trademark–Infringement Claim

 Alabama courts have long recognized a cause of action for unfair competition through imitation of a competitor's trade name. *See Fuqua v. Roberts,* 269 Ala. 59, 110 So.2d 886, 887 (1959). In order to make out such a claim, a plaintiff must demonstrate that its "trade is in danger of harm from the use of its name by the [defendant] in such a manner as it is likely to deceive the public into the belief that the [defendant's] affairs, in the respect complained of, are those of the [plaintiff]." *Id.* In other words, a central element of a claim of trademark infringement under Alabama common law, just as under the Lanham Act, is the likelihood that consumers will be misled by the similarity of the parties' marks.

 The court comes to the same conclusion with respect to the state-law infringement-and-unfair-practice claims

---

**31.** Where the court provides an in-depth discussion of the seven factors relevant to the likelihood-of-confusion element as to the trademark infringement claim, it need not repeat the same analysis when addressing trade dress infringement. *See John H. Harland,* 711 F.2d at 981 ("We need not discuss the first element of trade dress infringement, likelihood of confusion, in detail. The factors relevant to determining whether there is a likelihood of confusion between the trade dress of two products are 'essentially the same' as those relevant to determining whether there is a likelihood of confusion between the parties' trademarks.")

because the test for common-law infringement of trade or service marks under Alabama common law is same as it is under the Lanham Act. *See Arthur Young, Inc. v. Arthur Young & Co.,* 579 F.Supp. 384, 389 (N.D.Ala.1983). This court has found that a likelihood of consumer confusion has not been established under the Lanham Act. Therefore, Choice Hotels' state common-law claims fail as well.

## II. CONCLUSION

For the aforementioned reasons, this court finds that, although this case is very close, Choice Hotels has not established that a likelihood for confusion existed between Kaushik's Econotel and Choice Hotels' Econo Lodge brand marks. Accordingly, Choice Hotels' claims under the Lanham Act and Alabama common law are denied.

An appropriate judgment will be entered.